**MUSICK, PEELER & GARRETT LLP**
ATTORNEYS AT LAW
650 TOWN CENTER DRIVE, SUITE 1200
COSTA MESA, CALIFORNIA 92626-1925
TELEPHONE 714-668-2443

Vince M. Verde (State Bar No. 202472)
v.verde@mpglaw.com
Keith A. Watts (State Bar No. 208491)
k.watts@mpglaw.com

Anthony L. Martin (NV State Bar No. 8177)
AMartin@lrlaw.com
Lewis and Roca, LLP
3993 Howard Hughes Parkway, Ste. 600
Las Vegas, NV 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
Admitted *Pro Hac Vice*

Attorneys for Defendant Pyramid Services, Inc.

FILED
CLERK, U.S. DISTRICT COURT
AUG 11 2008
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES TRAYLOR, an individual; and ANDREW WARREN, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>PYRAMID SERVICES, INC.,<br><br>Defendant. | Case No. CV 07 4376 R (SSx)<br><br>**SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF DEFENDANT PYRAMID SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed concurrently with Notice of Motion, Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, Declaration of Anthony L. Martin *in Support*, Order & Judgment, and Master Certificate of Service]<br><br>Date:         July 21, 2008<br>Time:         10:00 a.m.<br>Courtroom:  8<br>Judge:        Honorable Manual L. Real |

Pursuant to Central District Local Rule 56-1, Defendant Pyramid Services, Inc. submits the following separate statement of uncontroverted facts in support of its motion for summary judgment:

| | |
|---|---|
| **FACT 1:** Pyramid is a privately held government services contractor that in part provides certain fire protection and emergency services to the United States Air Force at Plant 42, located in Palmdale, California.[1] Since 2001, Pyramid has directly provided fire protection and emergency services pursuant to the terms of the Performance Work Statement contained in its contract with the Air Force. | Martin Decl., Ex. 1, 71:7-72:21, 78:15-19; Ex. 2; Ex. 9, 34:16-20. |
| **FACT 2:** In accordance with the Performance Work Statement, Pyramid must provide 24/7, year round fire protection services. It is required to maintain at all times a certain number of fully qualified and trained fire operations personnel to ensure it can professionally respond to and mitigate emergencies involving hazardous materials, emergency rescues, structural fires/hazardous situations, miscellaneous fires and aircraft emergencies. (Id.) In so doing, it must ensure compliance with all applicable national, state, local and Department of Defense regulations, as well as National Fire Codes published by the National Fire Protection Association. | Martin Decl., Ex. 2. |
| **FACT 3:** Failure to comply with the Performance Work Statement could result in Pyramid's loss of the services contract. | Martin Decl., Ex. 1, 77:7-19. |

---

[1] Pyramid also provides maintenance, security, IT and engineering services at Plant 42.

| FACT 4: Traylor was hired by Pyramid as an Assistant Fire Chief of Operations ("AC") in March 2004. | Martin Decl., Ex. 3, 54:17-21; 62:7-12. |
|---|---|
| FACT 5: He remained in that position until he resigned, effective February 18, 2007. | Martin Decl., Ex. 3, 247:5-249:7; Ex. 4. |
| FACT 6: Traylor considered himself to be a member of management, and stated as much in his resignation letter. | Martin Decl., Ex. 3, 251:8253:9. |
| FACT 7: When he was hired, Traylor's annual base salary was $56,555.20. | Martin Decl., Ex. 3, 55:23-56:21; Ex. 5. |
| FACT 8: At the time he resigned, Traylor's annual base salary was $79,622.20. | Martin Decl., Ex. 3, 91:5-92:12; Ex. 6. |
| FACT 9: Throughout his entire employment, he received his annual salary in equal weekly installments, regardless of the number of hours he worked in a given workweek. | Martin Decl., Ex. 3, 72:1-74:3, 80:19-24. |
| FACT 10: Significantly, at no time was his salary subject to reduction by the company for any reason. | Martin Decl., Ex. 3, 72:1-3. |
| FACT 11: Although Warren had been employed in various capacities at Plant 42 with several different government contractors for approximately twenty years, including serving as Fire Chief and Deputy Chief/Training Officer, he did not become an AC with Pyramid until June 1, 2006.[2] | Martin Decl., Ex. 1, 20:5-18, 53:8-19, 56:1-20; Exs. 7 & 8. |

---

[2] Plaintiff Warren does not seek damages, nor does he claim he was improperly classified as exempt, for when he served in other capacities for Pyramid prior to becoming an AC on June 1, 2006.

3

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 1<br>2<br>3 | **FACT 12:** He served as an AC for Pyramid until he was terminated for poor performance on or about January 16, 2007. | Martin Decl., Ex. 3, 137:6-137:17. |
| 4<br>5<br>6<br>7<br>8<br>9 | **FACT 13:** When Warren became an AC on June 1, 2006, his annual base salary was $79,622.20, which he received in equal weekly installments, regardless of the number of hours he worked in a given workweek. And at no time was his salary subject to reduction by the company for any reason. | Martin Decl., Ex. 3, 44:12-15, 51:10-53:19, 53:8-19; Ex. 8. |
| 10<br>11<br>12 | **FACT 14:** At all relevant times, Pyramid employed approximately 57 fire operations personnel at its Plant 42 Fire Department ("Department"). | Martin Decl., Ex. 9, 34:22-35:8. |
| 13<br>14<br>15<br>16<br>17<br>18 | **FACT 15:** The Department consists of the following positions, ranked in order from highest to lowest in regards to the Department's chain of command: (1) Fire Chief ("FC"); (2) Deputy Chief/Training Officer ("DC"); (3) Assistant Chief of Operations ("AC"); (4) Station Captain; (5) Crew Chief; (6) Engineer; and (7) Firefighter.[3] | Martin Decl., Ex. 3, 69:7-70:6; Ex. 10, 14:6-16:5. |
| 19<br>20<br>21 | **FACT 16:** To advance through the ranks, members of the Department are required to obtain an ever increasing number of certifications. | Martin Decl., Ex. 3, 33:16-37:24. |
| 22<br>23 | **FACT 17:** There are two fire stations at Plant 42. | Martin Decl., Ex. 1, 26:20-25; Ex. 10, 14:22-15:4. |
| 24<br>25 | **FACT 18:** The stations are located a driving distance of approximately fifteen minutes apart. | Martin Decl., Ex. 10, 21:6-23:5. |

---

[3] The Department also employs five dispatchers, who at times report to the DC and the ACs.

| Fact | Source |
|---|---|
| **FACT 19:** All Department personnel in positions/rankings below the AC are members of a union (the "Bargaining Unit"), and the terms and conditions of their employment are in part covered by a collective bargaining agreement. | Martin Decl., Ex. 3, 88:5-10. |
| **FACT 20:** Pursuant to the collective bargaining agreement, Bargaining Unit personnel are paid on an hourly basis, and entitled to different benefits than the ACs. | Martin Decl., Ex. 3, 88:11-89:5. |
| **FACT 21:** ACs are Pyramid's first line management when the need to address Bargaining Unit discipline and grievances arise. | Martin Decl., Ex. 1, 117:18-118:4, 120:11-25. |
| **FACT 22:** ACs have the discretion to initiate and recommend discipline, and are members of the Department's hiring and promotion panels. | Martin Decl., Ex. 1, 81:20-84:16, 120:11-25, 118:20-120:10; Ex. 3, 188:2-189:6. |
| **FACT 23:** ACs, on behalf of management, regularly interact with shop stewards, dealing with unit matters to ensure the company's compliance with the terms of the collective bargaining agreement. | Martin Decl., Ex. 1, 118:5-14; Ex. 3, 182:7-185:17. |
| **FACT: 24:** In particular, Traylor spent approximately one hour per shift with the shop stewards in such capacity. | Martin Decl., Ex. 3, 184:24-185:17. |
| **FACT 25:** At all relevant times, Bargaining Unit personnel were assigned to one of three rotating shifts, designated as either operational Shift "A", "B" or "C". Each shift consists of 48 consecutive hours on-duty, followed by 96 consecutive hours off-duty. | Martin Decl., Ex. 1, 67:24-68:12; Ex. 3, 62:15-63:4; 94:6-22. |

| | |
|---|---|
| **FACT 26:** On any given shift, there are seventeen non-supervisory fire operations personnel on duty, assigned to each station as follows: (1) Station 1 - one Station Captain and six lower-ranking crew members; and (2) Station 2 - one Station Captain and nine lower-ranking crew members. | Martin Decl., Ex. 1, 68:3-69:7. |
| **FACT 27:** The operational shifts are supervised by the AC on duty, whose office is physically located at Station 2, across the airfield from the offices of the FC and DC. | Martin Decl., Ex. 3, 98:19-99:6; Ex. 10, 21:6-23:19. |
| **FACT 28:** Prior to June 1, 2006, when there were three ACs in the Department, each AC was assigned to one of the operational shifts. | Martin Decl., Ex. 3, 45:17-23, 92:3-8, 98:19-5. |
| **FACT 29:** Prior to June 1, 2006, both the FC and DC typically worked between the hours of 7:30 a.m. to 4:30 p.m., Monday through Friday. | Martin Decl., Ex. 1, 114:18-115:12; Ex. 3, 185:21-186:2; Ex. 10, 24:3-5; Ex. 11, 16:20-17:1. |
| **FACT 30:** Since June 1, 2006, Pyramid reduced the number of ACs in the Department from 3 to 2. | Martin Decl., Ex. 3, 90:4-10. |
| **FACT 31:** This resulted in the ACs' moving to an alternating 24 hour shift (i.e., 24 consecutive hours on-duty, followed by 24 consecutive hours off-duty), with both ACs having Wednesday off (otherwise known as a "Kelly Day"). | Martin Decl., Ex. 1, 84:25-85:18; Ex. 3, 91:19-92:16. |
| **FACT 32:** The ACs' shifts begin at 7:30 a.m. on one day, and end at 7:30 a.m. the next day. | Martin Decl., Ex. 3, 80:4-18. |
| **FACT 33:** The DC now works the Kelly Day, in addition to three eight hour shifts on Monday, Tuesday and Thursday. | Martin Decl., Ex. 1, 114:12-115:12; Ex. 11, 55:4-12. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

Case 2:07-cv-04376-R-SS   Document 65   Filed 08/11/08   Page 7 of 19   Page ID #:2189

| | |
|---|---|
| **FACT 34:** As ACs, Traylor and Warren "supervised all aspects of airfield, structural, confined spaces, medical, hazardous material firefighting and personnel management." They controlled the "firefighters in fire ground situations as well as the performance of care and maintenance of apparatus and equipment." | Martin Decl., Ex. 1, 72:22-73:7; Ex. 2; Ex. 3, 102:6-106:3. |
| **FACT 35:** And, they implemented management's directives and policies, and evaluated the operational activities of personnel assigned to their shifts. | Martin Decl., Ex. 3, 124:22-125:1. |
| **FACT 36:** Significantly, at no relevant time did either Traylor or Warren perform any manual tasks associated with the traditional role of a firefighter – i.e., neither performed any actual physical activity related to fire suppression, nor has either been required to perform daily manual duties at the station. | Martin Decl., Ex. 1, 122:19-124:22; Ex. 3, 154:15-159:22, 193:12-18; Ex. 12. |
| **FACT 37:** Rather, as a fire operations officer, their role was as a supervisor of a shift of 17 fire operations personnel located at two fire stations. | Martin Decl., Ex. 1, 68:1-71:6; Ex. 3, 101:12-102:1. |
| **FACT 38:** As confirmed by Traylor in approximately 125 pages of deposition testimony, the overall job duties performed by the ACs are accurately portrayed in a detailed job description. | Martin Decl., Ex. 3, 120:14-246:25; Ex. 13. |
| **FACT 39:** ACs advised, evaluated and provided counsel to employees regarding policies, procedures and directives of management. | Martin Decl., Ex. 3, 218:22-220:13. |

7
SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **FACT 40:** Initiated discipline and documented personnel incidents, including possessing the authority to suspend employees and recommend further appropriate discipline when serving as the senior officer on-duty. | Martin Decl., Ex. 1, 81:20-83:18, 120:11-25; Ex. 3, 187:5-188:1. |
| **FACT 41:** ACs ensured that all daily tasks assigned to shift personnel were accomplished. | Martin Decl., Ex. 1, 88:18-9, 123:5-17. |
| **FACT 42:** Although the ACs chose to delegate actual daily oversight of shift personnel to the Station Captains, if daily tasks and assignments were not satisfactorily completed, ACs directed the Station Captains to do the work correctly. | Martin Decl., Ex. 1, 89:14-90:19; Ex. 3, 157:4, 177:8-178:10. |
| **FACT 43:** ACs acted as Incident Commander during emergency situations. | Martin Decl., Ex. 1, 80:8-14. |
| **FACT 44:** As Incident Commander, the AC possessed the authority to direct Pyramid's and other's base assets to contain an emergency. | Martin Decl., Ex. 3, 190:3-191:6. |
| **FACT 45:** ACs regularly exercised the discretion to take command away from the Station Captains. | Martin Decl., Ex. 3, 196:11-197:6. |
| **FACT 46:** Under the incident command system, the Incident Commander was responsible for assuming command post and directing the incoming fire personnel and equipment to positions to best contain the emergency. | Martin Decl., Ex. 3, 189:10-22. |
| **FACT 47:** After an incident, the ACs prepared an "after incident" report. | Martin Decl., Ex. 3, 198:14-201:10. |
| **FACT 48:** This system and practice conformed with the National Incident Management System. | Martin Decl., Ex. 3, 198:14-201:10; Ex. 14. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **FACT 49:** Only approximately 5% of the time was the AC ever relieved by the FC as Incident Commander. If and when relieved by the FC, the AC nevertheless assumed a supervisory role over the fire operations personnel performing the actual fire suppression or emergency medical activities. | Martin Decl., Ex. 3, 191:23-193:11. |
| **FACT 50:** Each AC used their own style to direct the unit. | Martin Decl., Ex. 1, 109:15-110:9. |
| **FACT 51:** The FC and DC had such limited interaction with the ACs that, according to both Warren and Traylor, both the FC and DC had "limited personal knowledge of the duties performed by Plaintiff[s]." | Martin Decl., Ex. 1, 132:19-133:10; Ex. 3, 128:3-8. |
| **FACT 52:** When given tasks to perform by the FC, Plaintiffs were given little if any instruction on how to complete the same, and used their own experience and knowledge to determine whether and how to delegate the work and direct their Station Captains. | Martin Decl., Ex. 3, 127:18-128:2. |

| | |
|---|---|
| **FACT 53:** In June 2006, the Air Force required Pyramid to use and maintain an Automated Civil Engineering System "ACES". ACES is an overall tracking program which allows the Air Force to monitor the performance of the Department to ensure that Pyramid maintains compliance with the Performance Work Statement. Either the ACs, or Station Captains when directed by the ACs, input daily records of Department training, personnel and emergency response activities, including after emergency reports. ACs were responsible for ensuring that the operational shift activities were correctly input into ACES, and at times revised inaccurate incident reports. | Martin Decl., Ex. 1, 74:10-14, 103:6-105:12; Ex. 3, 65:1-18, 67:7-68:5, 103:25-104:7, 145:3-146:1, 149:10-18. |
| **FACT 54:** In addition to revising inaccurate incident reports, ACs prepared written summaries of incidents and then input the same into ACES. | Martin Decl., Ex. 1, 104:18-106:20; Ex. 3, 142:25-143:8. |
| **FACT 55:** ACs maintained and evaluated the progress of the fire prevention program by analyzing data, reviewing records and reports. ACs also prepared monthly reports to the Air Force summarizing maintenance and inspection activities. | Martin Decl., Ex. 1, 101:24-102:16; Ex. 3, 129:2-25, 148:17-21, 229:19-230:22, 240:20-242:11. |
| **FACT 56:** ACs completed daily overtime logs, which took approximately 30 minutes each day to prepare. | Martin Decl., Ex. 3, 130:8-131:4. |
| **FACT 57:** ACs' failure to submit the mandated reports within the required time frames would negatively impact Pyramid's services contract. | Martin Decl., Ex. 3, 143:25-144:13. |

| | |
|---|---|
| **FACT 58:** ACs performed random inspections of the stations, vehicles and equipment each month and provided written notes of their observations to the Station Captains for correction. ACs also observed daily vehicle checkouts to ensure quality and attention to detail by the engineers and those assisting them. The AC working the last day of each month ensured that the Quality Control Plan Inspection Checklist was completed and forwarded to the FC. | Martin Decl., Ex. 1, 94:18-95:6; Ex. 3, 115:10-22, 164:21-165:19; Ex. 15. |
| **FACT 59:** Training took place on a daily basis, and sometimes twice during a single shift. | Martin Decl., Ex. 1, 99:24-100:21. |
| **FACT 60:** ACs ensured that shift personnel attended classroom and live training exercises, and satisfactorily completed the appropriate training. The ACs were then required to signed-off on corresponding records memorializing attendance and completion of training. | Martin Decl., Ex. 1, 76:5-77:25, 124:23:127:24; Ex. 3, 118:22-119:1; 180:22-181-24; Ex. 16. |
| **FACT 61:** Failure to fulfill this obligation could result in loss of the Air Force contract. | Martin Decl., Ex. 1, 77:7-19. |
| **FACT 62:** At times, the ACs wrote and/or prepared lesson plans. | Martin Decl., Ex. 1, 135:10-13; Ex. 3, 119:2-16. |
| **FACT 63:** ACs did not require prior approval to vary the training materials. | Martin Decl., Ex. 1, 119:14-16. |
| **FACT 64:** When not actually conducting the classroom training, ACs observed the training session to ensure the quality thereof. | Martin Decl., Ex. 3, 97:13-15. |

| | | |
|---|---|---|
| 1 2 3 4 | **FACT 65:** According to Warren, after completion of the training, if he "noted any discrepancies or something in the class, [he] would talk to the instructor about it...," and suggest corrections. | Martin Decl., Ex. 1, 97:19-25. |
| 5 6 7 | **FACT 66:** If someone didn't perform well during a training exercise, the ACs could recommend and ultimately assign additional training. | Martin Decl., Ex. 1, 83:19-84:16. |
| 8 9 10 11 12 | **FACT 67:** ACs not only had to be aware of all laws and regulations applicable to the operation of an Air Force fire department, but through training, ensured that all fire operations personnel were in compliance with the same. | Martin Decl., Ex. 1, 76:15-25. |
| 13 14 15 | **FACT 68:** For safety purposes, ACs were required by the Air Force to direct several monthly live fire, structural, rescue, HAZMAT and aircraft emergency response exercises. | Martin Decl., Ex. 1, 74:15-19, 98:7-14-99:12; Ex. 3, 178:18-12, 202:8-203:8. |
| 16 17 | **FACT 69:** These live training exercises would take approximately 2 to 3 hours to complete. | Martin Decl., Ex. 3, 202:8-203:17. |
| 18 19 20 21 | **FACT 70:** ACs provided training instructor feedback, as well as evaluations and critiques of shift personnel after live training and emergency responses. | Martin Decl., Ex. 1, 75:11-22, 99:13-23; Ex. 3, 179:13-16, 195:11-21, 204:5-206:25. |
| 22 23 | **FACT 71:** The manner by which critiques were conducted was left to the discretion of the AC. | Martin Decl., Ex. 3, 206:8-25. |
| 24 25 26 27 | **FACT 72:** Per Air Force requirements, ACs conducted annual skills checks of all firefighting personnel, during which ACs would evaluate firefighters during a structural operation. | Martin Decl., Ex. 1, 128:4-130:7; Ex. 3, 243:13-246:25; Ex. 17. |

| | |
|---|---|
| **FACT 73:** On a daily basis ACs would counsel employees who were observed "having a bad day." That included giving the individual an opportunity to improve upon their performance before the AC recommended disciplinary action to the FC. | Martin Decl., Ex. 3, 221:19-226:4. |
| **FACT 74:** ACs ensured adequate, qualified staffing levels were attained each shift – i.e., 17 fire operations personnel on duty at all times. | Martin Decl., Ex. 1, 79:4-14, 91:10-12; Ex. 3, 138:7-139:8. |
| **FACT 75:** Under the Air Force program, the ACs could not randomly place firefighters into open positions. Rather, ACs had to ensure that they staffed each shift and station with the "right mixes of certifications assigned to the right jobs." | Martin Decl., Ex. 3, 139:5-8. |
| **FACT 76:** ACs were tasked with calling overtime. | Martin Decl., Ex. 1, 91:10-21. |
| **FACT 77:** And, in certain circumstances, ACs could move someone between the stations to cover a shift. | Martin Decl., Ex. 3, 152:17-153:8, 220:14-221:18. |
| **FACT 78:** ACs were responsible for the correct utilization of the Department's equipment and materials. They ensured inventories were conducted and reconciled as required by relevant standard operating guidelines. | Martin Decl., Ex. 3, 139:9-24, 163:1-14. |
| **FACT 79:** ACs ensured that the department guidelines and procedures were met by Department personnel, that equipment was kept in clean and orderly manner, that maintenance was performed and that unserviceable equipment was tagged and removed from operation. | Martin Decl., Ex. 3, 176:12-177:7, 228:25-229:6. |

| | |
|---|---|
| **FACT 80:** ACs ensured that hose and vehicle tests were scheduled and performed properly by the crews. | Martin Decl., Ex. 1, 94:18-95:6, 101:20-24; Ex. 3, 212:9-215:12. |
| **FACT 81:** ACs oversaw all vehicle inspections because of the importance and value of the asset to Pyramid. | Martin Decl., Ex. 3, 214:22-215:12. |
| **FACT 82:** ACs conducted monthly inspections of personal protective equipment to ensure serviceability, after which they'd prepare a report and submit to the FC for review. | Martin Decl., Ex. 1, 101:24-102:16. |
| **FACT 83:** As building inspectors, ACs are required to inspect buildings, determine hazards contained therein, and then are responsible for supervising the development of and/or revisions to written prefire plans. | Martin Decl., Ex. 1, 73:17-19; Ex. 3, 136:21-137:20, 174:18-21. |
| **FACT 84:** ACs reviewed Department timesheets for accuracy. If the timesheets were not accurate, AC would "kick[ed] them back to the shop steward. Once properly completed, the AC sign[ed] the timesheets, verifying its accuracy." | Martin Decl., Ex. 3, 173:7-20. |
| **FACT 85:** Between 14 and 15 hours a day, the AC was the Senior Fire Officer on-duty, responsible for the operation of the entire Department. | Martin Decl., Ex. 1, 114:12-115:23; Ex. 3, 187:1-188:1. |
| **FACT 86:** At all times, regardless of whether either the FC or DC was on-site, the AC was the fire operations personnel supervisor. | Martin Decl., Ex. 3, 227:5-10. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **FACT 87:** On average, the Department responded to approximately one emergency call per shift, during which the AC typically served as Incident Commander. | Martin Decl., Ex. 1, 115:13-117:2; Ex. 3, 191:23-193:11, 198:3-8. |
| **FACT 88:** Such emergency responses lasted between one to two hours, and at times required the AC to complete a post-incident report, the length of which depended on the type of incident. | Martin Decl., Ex. 3, 197:18-201:20; Ex. 14. |
| **FACT 89:** The AC's 24 hour shift began at 7:30 a.m. | Martin Decl., Ex. 1, 85:9-18. |
| **FACT 90:** Prior to each shift, the AC engaged in a "pass-on" with the off-going AC. During the approximately 20 minute face-to-face meeting, the ACs discussed the status of vehicles, any change in assigned tasks, report any unusual or important items, staffing issues, and any topic needed to ensure proper administration of the upcoming shift. | Martin Decl., Ex. 1, 85:19-86:19. |
| **FACT 91:** Roll call, which lasted approximately 5 minutes, was then held at 7:30 a.m. | Martin Decl., Ex. 1, 86:23-87:1. |
| **FACT 92:** Although roll-call was conducted by Station Captains, ACs passed-on any information they felt was pertinent to the firefighters. | Martin Decl., Ex. 1, 87:2-7; Ex. 3, 167:5-169:6. |
| **FACT 93:** After roll-call, the ACs met with each Station Captain for several minutes to discuss the day's training schedule and tasks the firefighters were required to complete that day. | Martin Decl., Ex. 1, 87:8-90:24. |
| **FACT 94:** ACs then observed vehicle operational checkout at both stations, which took approximately one hour. | Martin Decl., Ex. 3, 165:20-168:4. |

| | |
|---|---|
| **FACT 95:** During the checkouts, ACs would assess the driver operators' knowledge of their vehicle, conduct a visual inspection of the vehicle, and if the ACs noticed any safety concerns, directed the engineers to correct them immediately. | Martin Decl., Ex. 3, 166:6-167:17. |
| **FACT 96:** The ACs would then review the disposition of overtime to determine how many personnel were needed to fill open shifts and positions to ensure adequate staffing levels on each shift, as well as the order in which to call the firefighters. | Martin Decl., Ex. 1, 90:25-92:19; Ex. 3, 138:14-139:8. |
| **FACT 97:** At around 8:30 a.m., the AC would then call the individuals on the overtime call list. | Martin Decl., Ex. 1, 90:25-92:19. |
| **FACT 98:** If the AC was unable to reach a listed individual on the first attempt, he was required to wait 15 minutes for a call back prior to calling the next person on the list. | Martin Decl., Ex. 3, 131:5-132:10. |
| **FACT 99:** During those 15 minutes, the ACs reviewed e-mails from either the FC, other Pyramid management or the Air Force, as well as worked on other projects. | Martin Decl., Ex. 1, 94:6-95:18; Ex. 3, 132:11-143:8. |
| **FACT 100:** Such other projects included the review, preparation, maintenance and updating of records of inspections and drills, prefire plans, inventory and training records, reportable fire incident reports, rosters and schedules; they conducted in-person meetings with Station Captains; and performed the physical inspection of the station, along with its equipment and vehicles. | Martin Decl., Ex. 3, 136:18-143:8, 152:5-15, 175:5-17. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| **FACT 101:** Generally, calling overtime took approximately one to two hours. | Martin Decl., Ex. 1, 96:4-14. |
| **FACT 102:** The ACs would also call for overtime in the afternoon to the extent necessary. | Martin Decl., Ex. 1, 100:10-15. |
| **FACT 103:** Once filling of overtime was completed, the ACs either met with the FC and DC, or conducted/observed classroom training. | Martin Decl., Ex. 1, 97:9-12. |
| **FACT 104:** Training lasted between one to two hours in the morning, and sometimes occurred twice in one day. | Martin Decl., Ex. 1, 99:24-100:21. |
| **FACT 105:** Meetings with the FC and DC, which occurred in the FC's office, lasted for approximately one hour. During these meetings, the ACs discussed the status of the Department's operations, progress towards completion of assignments and goals, and at times were delegated additional duty assignments. | Martin Decl., Ex. 1, 100:22-101:15; Ex. 3, 125:16-126:19. |
| **FACT 106:** The remainder of the morning after classroom training was finished was typically spent overseeing/observing inspections and tests of vehicles and equipment, and preparing Department reports. | Martin Decl., Ex. 1, 101:16-102:19. |
| **FACT 107:** Lunch, which lasted one hour, was around noon time. | Martin Decl., Ex. 1, 102:17-22; Ex. 3, 215:13-19. |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT
DEFENDANT PYRAMID SERVES, INC.'S MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | **FACT 108:** After lunch, if no afternoon training was scheduled, the ACs completed any overtime calls to the extent necessary, as well as continued to review, revise and prepare training, incident, dispatch, overtime, monthly Air Force and other reports, as well as input data into the ACES system. | Martin Decl., Ex. 1, 102:23-107:2; Ex. 3, 130:4-131:4, 215:19-218:21. |
| 7<br>8<br>9 | **FACT 109:** Between 2:30 p.m. and 3:00 p.m., the ACs met with the FC for less than an hour to discuss any issues or receive additional assignments. | Martin Decl., Ex. 1, 107:3-9; Ex. 3, 125:16-127:17, 207:20-25. |
| 10<br>11<br>12<br>13 | **FACT 110:** The remainder of the afternoon before dinner at 4:30 p.m. was spent performing the additionally assigned tasks, or remaining administrative work. | Martin Decl., Ex. 1, 111:1-4. |
| 14<br>15<br>16<br>17<br>18 | **FACT 111:** Dinner lasted until 5:30 p.m., after which for several hours the ACs continued to complete, prepare and input reports on ACES, complete rosters, address leave requests and staffing concerns, prepare prefire plans, and work on any additional projects. | Martin Decl., Ex. 1, 111:4-25; Ex. 3, 66:1-16, 208:16-211:11. |
| 19<br>20<br>21<br>22 | **FACT 112:** Typically, unless interrupted by an emergency, the next couple of hours for the ACs was considered downtime, during which they interacted with the Bargaining Unit. | Martin Decl., Ex. 1, 112:1-13. |
| 23<br>24<br>25 | **FACT 113:** Sleep time was between 10:00 p.m. and 6:00 a.m. | Martin Decl., Ex. 1, 59:18-20, 112:14-18; Ex. 3, 63:2-10, 208:1-8. |
| 26<br>27<br>28 | **FACT 114:** Interruptions, if any, during sleep time were due to either an emergency or someone calling off shift because of sickness. | Martin Decl., Ex. 1, 59:21-62:21; Ex. 3, 63:11-16. |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 | **FACT 115:** If the "emergency" call from dispatch was due to an apparent faulty alarm, the AC would typically direct the Station Captain to send a crew and conduct a routine check of the alarm system. | Martin Decl., Ex. 1, 60:9-61:3. |
| 5<br>6 | **FACT 116:** If it was a true emergency, the AC acted as incident commander. | Martin Decl., Ex. 1, 61:4-19. |
| 7<br>8<br>9<br>10<br>11 | **FACT 117:** At the end of each shift – i.e., between 6:00 a.m. and 7:30 a.m. the next day - the ACs completed any reports that needed to be turned into the FC while the firefighters conducted morning cleanup. | Martin Decl., Ex. 1, 95:15-96:3, 112:19-24. |
| 12<br>13<br>14 | **FACT 118:** The AC then compiled any completed overtime, training, building and equipment inspection reports and submitted them to the FC after roll-call. | Martin Decl., Ex. 1, 113:23-114:11. |

*[Handwritten annotation: I have read and do adopt each of the facts set forth as undisputed in support of summary judgment]*

DATED: June 6, 2008   LEWIS AND ROCA LLP

By: _____
Anthony L. Martin
3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169

MUSICK, PEELER & GARRETT LLP
Vince M. Verde
Keith A. Watts
650 Town Center Drive, Suite 1200
Costa Mesa, CA 92626
*Attorneys for Defendant*

IT IS SO ORDERED
DATE _____ Aug. 11, 2008
_____
U.S. DISTRICT COURT JUDGE